ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER C. GOLD (*Pro Hac Vice*)
JASON H. ALPERSTEIN
MARK J. DEARMAN
STUART A. DAVIDSON (*Pro Hac Vice*)
DOROTHY P. ANTULLIS
ERIC S. DWOSKIN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
cgold@rgrdlaw.com
jalperstein@rgrdlaw.com
mdearman@rgrdlaw.com
sdavidson@rgrdlaw.com
dantullis@rgrdlaw.com
edwoskin@rgrdlaw.com

*Attorneys for Plaintiff and the Proposed Class*

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE SCHOOL BOARD OF MIAMI-DADE COUNTY, FLORIDA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> JUUL LABS, INC. and ALTRIA GROUP, INC., <br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT <br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff The School Board of Miami-Dade County, Florida ("Miami-Dade Schools" or "Plaintiff") brings this class action individually and on behalf of all others similarly situated against Defendants JUUL Labs, Inc. ("JUUL") and Altria Group, Inc. ("Altria") (collectively, "Defendants") and asserts claims for violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961, *et seq.*, public nuisance, negligence, and unjust enrichment.

## I.    INTRODUCTION

1.    This action arises out of Defendants' creation of a nationwide epidemic – based on numerous fraudulent activities – of underage nicotine addiction caused by "vaping" with JUUL's popular electronic cigarette or "e-cigarette," which has directly resulted in Plaintiff and other similarly situated school districts in Florida and across the country being forced to expend their limited resources to attempt to curb the severe public nuisance Defendants created, and which is ongoing.

2.    Defendants created the public nuisance by, among other things: (a) designing the JUUL e-cigarette and its packaging to aesthetically appeal to kids and to be easily concealable; (b) selling nicotine cartridges or "JUULpods" in multiple fruity flavors that appeal to kids (*e.g.* Fruit Medley, Crème Brûlée, Mango, Cool Cucumber, and Cool Mint); (c) designing its patented nicotine formula to be significantly more addictive than cigarettes; (d) directly marketing the JUUL e-cigarette to children through youthful, colorful and vibrant images in print advertising, by saturating social media channels frequented by children, by paying young "influencers" to endorse JUUL's products, by hosting "pop-up" parties in trendy cities to provide free samples of its fruity JUULpods and by making purported "educational" presentations to kids on school campuses to falsely represent the purported "safety" of JUUL's e-cigarette; and (e) making false and misleading statements about the safety of the JUUL e-cigarette and downplaying or omitting disclosure of the risks of addiction associated with its use.

3. The current epidemic of underage nicotine addiction that JUUL created is no accident. JUUL's founders and executives closely studied the Big Tobacco playbook and successfully implemented the techniques that Big Tobacco used to hook a prior generation on nicotine in order to mislead a new generation into believing that e-cigarettes, unlike traditional cigarettes, are safe and not addictive. With this unconscionable strategy, JUUL experienced a meteoric rise in the popularity of its e-cigarette and secured a 76% share of the e-cigarette market in only a few short years.

4. JUUL, with the help of significant financial investment from Altria – the company behind the Marlboro brand that now owns a 35% stake in JUUL – was so effective in marketing its e-cigarettes to children that its marketing efforts are now self-perpetuating. Obviously, kids who are addicted to JUUL's e-cigarette will continue to use the product. But JUUL's marketing has made its e-cigarette a teen pop culture icon and status symbol, so kids recommend JUUL to their peers, and other kids are inclined to begin using JUUL to fit in with their peer group. Further, even though JUUL allegedly closed its social media accounts, JUUL's social media reach continues through peer-to-peer viral marketing by kids who continue to promote JUUL-related hashtags and images, which JUUL initiated.

5. Defendants' unlawful practices have generated billions of dollars in revenue in just a few short years by ensnaring a new generation of the nation's youth in addiction. This has created a national epidemic and a public nuisance for schools across the country that are now faced with the task of undoing the damage Defendants caused by educating students and young people on the dangers of e-cigarette use and policing the significantly increased use of e-cigarettes.

6. Plaintiff, like school boards across the nation, has been forced to expend its limited resources to attempt to curb the public nuisance Defendants created. By this action, Plaintiff, individually and on behalf of the Class (defined below), seeks to put an end to Defendants' unconscionable and fraudulent practices, to recover damages caused by those practices, and to force Defendants to abate the public nuisance they created by, among other things, establishing an abatement fund to be used by Plaintiff and the Class for that purpose.

## II.  PARTIES

7.  Plaintiff The School Board of Miami-Dade County, Florida, oversees the fifth largest public school system in the nation, with a student enrollment of 356,086 in 467 schools district wide as of August 30, 2017.  Plaintiff's offices are located at 1450 NE 2nd Avenue, Miami, Florida.

8.  Defendant JUUL Labs, Inc. is, and at all relevant times was, a Delaware corporation with its principal place of business in San Francisco, California.  JUUL originally operated under the name PAX Labs, Inc. until 2017.  JUUL manufactures, markets and sells e-cigarettes and pre-filled nicotine cartridges called JUULpods.

9.  Defendant Altria Group, Inc. is, and at all relevant times was, a Virginia corporation with its principal place of business in Richmond, Virginia.  Altria is the parent company of Phillip Morris USA (producer of Marlboro cigarettes).  On December 20, 2018, Altria purchased a 35% stake in JUUL.

## III.  JURISDICTION AND VENUE

10.  This case is being direct-filed into this Court pursuant to Case Management Order No. 3 - Direct Filing Order, In re Juul Labs, Inc., Mktg., Sales Practices, and Prods. Liab. Litig., Case No. 19-md-02913-WHO, ECF No. 309 (N.D. Cal. Dec. 13, 2019).  In the absence of direct filing, Plaintiff would have filed its Complaint in the United States District Court for the Northern District of California.

11.  This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1332, as well as 18 U.S.C. §1964(c).  The Court also has supplemental jurisdiction over Plaintiff's state and common-law claims under 28 U.S.C. §1367.

12.  This Court has personal jurisdiction over each defendant because JUUL is headquartered in and does business in the State of California, each defendant purposefully availed itself of the privilege of exploiting forum-based business opportunities, and the exercise of personal jurisdiction is consistent with Cal. Civ. Proc. Code §410.10. This Court also has personal jurisdiction over Defendants under 18 U.S.C. §1964(c).

13.     Venue is proper pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims asserted herein arose in this District and Defendants are subject to personal jurisdiction in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    JUUL Sought to Disrupt the Tobacco Industry with a Highly Addictive E-Cigarette

14.     In 2015, with $50 million in venture capital funding, JUUL launched its new e-cigarette device.  JUUL's e-cigarette looks a lot like a small USB flash drive.  In fact, the device is charged through a USB port.  The e-cigarette consists of a rechargeable battery, a heating element, and a JUULpod containing JUUL's patented nicotine solution.  The size, shape, and USB-like appearance of JUUL's e-cigarette makes it easy to conceal, especially from untrained school officials who might assume it is an innocuous USB flash drive.



15.     The nicotine dose that a JUUL e-cigarette delivers is extremely potent and addictive; significantly more so than the nicotine delivered by traditional cigarettes.

16.     The National Institutes of Health has noted that the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[1]  As revealed by a

---

[1]    *See* NCBI, *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable      Disease:      A      Report      of      the      Surgeon      General*      (2010), https://www.ncbi.nlm.nih.gov/books/NBK53018/#ch4.s92.

1973 memo by a scientist for R.J. Reynolds Tobacco Company ("RJR") entitled, "Cigarette Concept to Assure RJR a Larger Segment of the Youth Market," tobacco companies have long exploited this fact in order to increase the addictiveness of cigarettes by using nicotine salt additives like nicotine benzoate to increase nicotine delivery, such as the those developed and patented by RJR in order to give cigarettes an "additional nicotine 'kick.'"[2]

17.    JUUL sought to add the same "nicotine kick" to its e-cigarette that RJR and other tobacco companies relied on for years to create addicts and repeat customers who supported the billion dollar tobacco industry.  Taking the lead from RJR, JUUL developed and patented a nicotine salt formula (nicotine benzoate) that combined benzoic acid with nicotine (U.S. Patent No. 9,215,895, the "'895 patent").  Blood plasma studies in the '895 patent show that nicotine benzoate increases nicotine delivery over cigarettes by up to four times.  Thus, although JUUL advertises some of its JUULpods as containing 5% nicotine, that representation is materially misleading because, when considering the accelerated rate of nicotine absorption that occurs in the body with JUUL's patented nicotine salt formula, a user ultimately receives a higher and stronger dose of nicotine than advertised.

18.    JUUL's advertisement of the amount of nicotine in a JUULpod is also materially misleading because independent studies have confirmed that JUULpods actually contain more nicotine than advertised.  One study tested four flavors of JUULpods advertised as 4% strength and found that they contained a 4.5% benzoic acid solution, and that JUULpods advertised as 5% nicotine actually contained a concentration of 6.2% nicotine salt.[3]  These variances from the advertised amounts of nicotine are significant.  Even "a small percentage can double, triple, or quadruple the amount of free nicotine available for inhalation in cigarette smoke." *United States v. Philip Morris USA., Inc.*, 449 F. Supp. 2d 1, 353 (D.D.C. 2006).

---

[2]    Memorandum from Frank G. Colby (Dec. 4, 1973), https://www.industrydocuments.ucsf.edu/ tobacco/docs/#id=mzfx0091.

[3]    James F. Pankow, et al., *Benzene formation in electronic cigarettes*, PLOS ONE (Mar. 8, 2017), https://doi.org/10.1371/journal.pone.0173055.

19.     JUULpods containing 1.2% more nicotine than advertised on a 5% label – a 20% increase – together with the faster nicotine absorption that JUUL's patented formula provides, creates an e-cigarette that is far more addictive than any e-cigarette on the market, and even more addictive than traditional cigarettes.  Defendants failed to disclose these facts and actually downplayed the addictive properties of JUUL's e-cigarette in order to increase adoption of the product by minors.

20.     Prior to launching its e-cigarette in June 2015, JUUL provided media outlets with charts illustrating the results of a self-commissioned study purporting to compare changes in blood-nicotine levels resulting from the use of JUUL e-cigarettes as compared to traditional cigarettes and other e-cigarettes.





21.     Both charts are false and misleading as they directly contradict the results of the study reported in JUUL's own '895 patent, which concluded that JUULpods deliver nicotine to the blood stream up to four times faster than traditional cigarettes.  Indeed, contrary to the results of the study reported in JUUL's '895 patent, these charts falsely represented that JUULpods deliver 25% less nicotine than traditional cigarettes and, thus, created the false impression that JUUL e-cigarettes are safer and less addictive than other e-cigarettes and traditional cigarettes.

22.     As noted above, JUUL also misrepresented the specific amount of nicotine contained in a JUULpod, and it also falsely represented that the amount of nicotine in a single JUULpod is approximately equivalent to one pack of cigarettes or 200 puffs.  These statements were false and materially misleading because independent studies show that JUULpods contain at least 20% more nicotine than advertised, and, moreover, because JUUL's patented nicotine salt formula delivers nicotine into the blood stream up to four times faster than a traditional cigarette, JUUL's comparison of a JUULpod to a pack of cigarettes is like comparing apples and oranges.

23.     The fact that JUUL e-cigarettes – which are plainly marketed to children – deliver a dose of nicotine that is far stronger and far more potent than traditional cigarettes is extremely troubling.  Nicotine is a highly addictive and harmful substance, especially for adolescents whose developing brains are particularly susceptible to addiction.  Numerous studies have shown that

nicotine use by adolescents disturbs cognitive function and development.  In addition, vaping itself introduces harmful substances into the lungs, which can lead to pulmonary disease and other health issues.  Indeed, to date, there have been over 2,000 reported cases of vaping-related lung illness and 48 reported deaths across the country.[4]

**B.    The Big Tobacco Playbook: JUUL's Marketing Directly Targets Kids**

24.    As Big Tobacco has long known, minors are the prime target market for addictive tobacco products.  Nearly 80% of smokers begin before the age of 18.  Because the developing adolescent brain is more sensitive to addiction, adolescents who begin smoking are more likely to become life-long addicts and customers.  As RJR's Vice-President of Marketing explained in 1974, the "young adult market . . . represent[s] tomorrow's cigarette business.  As this 14-24 age group matures, they will account for a key share of the total cigarette volume – for at least the next 25 years."[5]  In order to dominate the e-cigarette market, JUUL studied the Big Tobacco playbook and shamelessly adopted the same strategy of targeting this key demographic in order to increase its own profits.

**1.    JUUL's Sleek "Tech" Design and Kid-Friendly Fruit Flavors**

25.    From the outset, JUUL deliberately designed its e-cigarette to be attractive to young people.  Rather than replicate the cylindrical shape of a cigarette, which has negative associations in peoples' minds, JUUL designed its e-cigarette to be sleek and rectangular and to look like a tech device that would appear attractive beside an iPhone.  Indeed, JUUL designed the packaging of its e-cigarette to be clean and minimalist, reminiscent of the packaging for an iPhone that appeals to teens.  As noted, JUUL's e-cigarette is also small and easily concealable and resembles a USB flash drive for a computer, which is commonly used in schools, and thus, adds to the concealability of the device by students.

---

[4]    Centers for Disease Control and Prevention, *Outbreak of Lung Injury Associated with E-Cigarette Use, or Vaping* (Dec. 11, 2019), https://www.cdc.gov/tobacco/basic_information/e-cigarettes/severe-lung-disease.html.

[5]    UCSF Library, *Truth Tobacco Industry Documents* (Sept. 30, 1974), https://www.industry documentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091.

26.     Long ago, Big Tobacco was banned from selling flavored cigarettes precisely because they appeal to kids.  That did not stop JUUL from developing its own line of JUULpods to include multiple flavors that are attractive to kids – flavors like Fruit Medley, Crème Brûlée, Mango, Cool Cucumber, and Cool Mint – which demonstrates the egregiousness of JUUL's conduct.



27.     JUUL even went a step further to downplay the hazards of e-cigarette use by associating its JUULpods with harmless foods.





28.    Unsurprisingly, JUUL's reliance on kid-friendly flavors achieved the same success in attracting underage customers as Big Tobacco.  Indeed, 81.5% of underage e-cigarette users said they used e-cigarettes "because they come in flavors I like."[6]

29.    Altria is well aware of the dangers posed by kid-friendly flavors.  Notably, after failing to achieve JUUL-like success with its own e-cigarette product, Altria, in a letter to the U.S. Food and Drug Administration ("FDA") on October 25, 2018, claimed to have "serious concerns" about youth access to e-vapor products, and to "address what FDA has called an epidemic of underage use of e-vapor products[,]" Altria announced that it was removing from the market "all flavored e-vapor products except for tobacco, menthol and mint."[7]  Altria's concerns seem disingenuous, however, as less than two months later, on December 20, 2018, Altria announced a

---

[6]    NCBI, *E-Cigarette Use Among Youth and Young Adults: A Report of the Surgeon General* (2016), https://www.ncbi.nlm.nih.gov/books/NBK538687/.

[7]    Philip Morris USA, *Altria Takes Action to Address Youth E-Vapor Use* (Oct. 25, 2018), http://www.altria.com/harm-reduction/Helping-Reduce-Underage-Tobacco-Use/addressing-youth-e-vapor-use/Pages/default.aspx.

1    $12.8 billion dollar investment in JUUL, which gave Altria a 35% stake in JUUL, and allowed it

2    to profit off the success of flavored e-cigarettes through the back door while, through the front

3    door, paying lip service to concerns about the youth vaping epidemic.

4         30.    The youth attraction to JUULpod flavors ultimately prompted the FDA to write to

5    JUUL in September 12, 2018 to suggest that it remove flavored products from the market as a

6    means of curtailing use by minors.  As the underage vaping epidemic worsened, Massachusetts,

7    Michigan, New York, Rhode Island, Montana, Oregon and Washington all exercised executive

8    powers to ban the sale of flavored e-cigarettes in their respective states, while other states are

9    considering enacting similar legislation.  And San Francisco – home to JUUL's corporate

10   headquarters – voted to ban outright the sale and distribution of e-cigarettes in the city.

11        31.    Even though JUUL claims it has begun to restrict the availability of flavored

12   JUULpods, third-party companies now sell their own lines of fruit-flavored e-cigarette pods to be

13   used with the JUUL e-cigarette.

14         **2.    JUUL's Vaporized Campaign**

15        32.    Historically, tobacco companies targeted the key adolescent market by:

16   "(1) employ[ing] the concept of peers in order to market to teenagers; (2) us[ing] images and

17   themes in their marketing that appeal to teenagers; and (3) employ[ing] advertising and promotion

18   strategies to knowingly reach teenagers."  *Philip Morris*, 449 F. Supp. 2d at 572.  Their

19   advertisements relied on imagery highlighting "independence, adventurousness, sophistication,

20   glamour, athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness,

21   and being 'cool.'"  *Id*. at 571.

22        33.    These words describing historical Big Tobacco 20th century advertising techniques

23   also describe JUUL's 21st Century advertising campaign exactly.  And that is no accident.  JUUL's

24   founders publicly acknowledged that they studied the thousands of internal Big Tobacco

25   documents that were made available under the Master Settlement Agreement between Big

26   Tobacco and the states, stating that those documents "became a very intriguing space for us to

27   investigate because we had so much information that you wouldn't normally be able to get in most

28   industries. And we were able to catch-up, right, to a huge, huge industry in no time. And then we

1    started building prototypes."[8]

2        34.    Indeed, JUUL wasted no time at all to "catch up" to Big Tobacco.  JUUL launched

3    its e-cigarette in June 2015 with its "Vaporized" advertising campaign that clearly targeted young

4    people with images and themes that appeal to teenagers,[9] including a spread in *VICE* magazine,

5    which claims to be the "#1 youth media company in the world."[10]





[8]    Gabriel Montoya, *PAX Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/  (last visited Dec. 11, 2019).

[9]    Declan Harty, *JUUL Hopes to Reinvent E-cigarette Ads With "Vaporized" Campaign*, AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-adscampaign/299142/.

[10]    Vice Digital Media Kit (Jan. 2016), https://upload-assets.vice.com/files/2016/01/15/1452894236compressed.pdf.

CLASS ACTION COMPLAINT                                                          - 12





1
2
3
4
5
6
7
8
9
10
11



12
13
14
15
16
17
18
19
20
21
22
23
24
25



26
27
28

35.    It is important to note that the handful of images shown above are merely examples. Stanford University researchers investigating JUUL's marketing campaign uncovered thousands

1  of other similar youth-oriented images that the company used to market its products.[11]

2      36.    Regarding JUUL's advertising, the Campaign for Tobacco-Free Kids noted

3  "obvious trends that appeal to adolescents in e-cigarette campaigns such as celebrity endorsements,

4  sponsorships and various flavors" and expressed "concern about the Juul campaign because of the

5  youth of the men and women depicted in the campaign, especially when adjoined with the

6  design."[12]

7      37.    In addition to the vibrant and youthful imagery used in the "Vaporized" campaign,

8  JUUL followed the trend of "pop-up" bars and restaurants that attract a young and hip clientele

9  seeking an exclusive experience by setting up a number of pop-up "JUUL bars" and "launch

10  parties" in hip urban cities like Los Angeles and New York.

11      38.    JUUL's launch parties were patently youth-oriented, and guests were invited to try

12  JUUL's products for free and share selfies on social media using the hashtag

13  #LightsCameraVapor.



An ad for Juul's launch party posted on Instagram and shared by Juul (JuulVapor).  SRITA

---

11    *See*    http://tobacco.stanford.edu/tobacco_main/subtheme_pods.php?token=fm_pods_mt068.php (last visited Dec. 11, 2019); *see also* Erin Brodwin, *See how Juul turned teens into influencers and threw buzzy parties to fuel its rise as Silicon Valley's favorite e-cig company*, Business Insider (Nov. 26, 2018), https://www.businessinsider.com/stanford-juul-ads-photos-teens-e-cig-vaping-2018-11.

12    *See supra* n.9.

1
2
3
4
5
6
7
8
9
10
11
12
13
14



15
16
17
18
19
20
21
22
23
24
25



26        39.    One of the aims of JUUL's launch parties was to give away free samples of its

27  products.  More than 1,500 samples were given out at each event, according to materials viewed

28  by Business Insider from the Los Angeles-based advertising firm that helped JUUL plan the

events.  JUUL did not stop this practice when it learned that U.S. regulators forbade free sampling of tobacco products – it simply skirted the prohibition by charging $1 for each sample.

### 3.   JUUL Saturated Social Media with Youth-Oriented Content

40.   JUUL also directly targeted minors by saturating social media channels frequented by kids, including Instagram, Facebook and Twitter, where JUUL tweeted nearly 5,000 times in 2017 alone with seemingly unthreatening and innocuous tweets that downplayed the serious health and addiction risks of its product.



41.   JUUL paid young "influencers" with large social media followings to promote its product on their social media channels, and JUUL pioneered a number of JUUL-related hashtags that would be shared by kids and create viral peer-to-peer communication among teens who essentially became brand ambassadors for JUUL and ultimately integrated JUUL's own marketing into user-generated content that would, and has, perpetuated even after JUUL allegedly closed its social media accounts.

42.   JUUL's social media campaign was hugely successful.  One study found that despite spending "no recorded money" on advertising in the first half of 2017 (other than $20,000 on business-to-business advertising), JUUL grew by nearly 700%.[13]  By contrast, one of JUUL's less-successful competitors spent $16 million on television advertisements alone and still failed to achieve the same growth that JUUL experienced.  JUUL's explosive growth in 2017 correlates precisely with its increased reliance on Twitter during the same period:

---

[13]   Jidong Huang, et al., *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market*, Tobacco Control (May 31, 2018), http://tobaccocontrol.bmj.com/content/early/2018/05/31/tobaccocontrol-2018-054382.

**4.      JUUL Marketed Directly to Kids in Schools Through Marketing Events Disguised as "Educational" Programs**

43.     Like Big Tobacco before it, JUUL attempted to go right to the source in its efforts to market to children: schools.  Disturbingly, JUUL reached out to a number of school officials to offer free "educational" presentations to students purportedly designed to discourage teen vaping. JUUL's intention with the program, however, was anything but altruistic.  JUUL simply wanted to market its product directly to children, albeit while misrepresenting the health risks and addictive properties of its e-cigarette.  Rather than discourage vaping use, in one example, JUUL representatives on school campuses reportedly told students that JUUL was "totally safe," that it "was much safer than cigarettes," that the "FDA would approve [JUUL] any day[,]" that the "FDA was about to come out and say [JUUL] was 99% safer than cigarettes . . . and that . . . would happen very soon[,]" and that a student "should mention JUUL to his . . . friend . . . because that's a safer alternative than smoking cigarettes, and it would be better for the kid to use."[14]

44.     Further, JUUL paid hundreds of thousands of dollars to organizations like LifeSkills, Inc. and The Freedom & Democracy Schools Foundation, Inc. in order to reach thousands of students with marketing messages disguised as educational content.

45.     The evidence suggests that JUUL made similar presentations to students at other

---

[14]     FDA Warning Letter (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

1   schools across the country.

2        **5.    JUUL's Unlawful Marketing Succeeded in Securing a Position**
3            **in Teen Pop Culture that Continues to Exponentially Grow**
             **JUUL's Popularity Among Adolescents**

4        46.    Like Big Tobacco before, the long-lasting damage from JUUL's direct-to-kid

5   marketing campaign cannot be overstated. Not only does addiction ensure that adolescents

6   continue to use and buy JUUL's products, but JUUL succeeded in making its e-cigarette a teen

7   pop culture icon.  This ensures that kids will continue to use the product for status and to

8   recommend the product to their peers, who will likewise be inclined to begin using the product to

9   join the crowd.

10       47.    Taking notice of this obvious fact, a number of manufacturers have begun to sell

11  JUUL accessories that are clearly designed for children, and that serve to further solidify JUUL's

12  position in teen pop culture.  For example, some companies sell JUUL "skins" to decorate a JUUL

13  e-cigarette with kid-focused imagery of Batman, The Simpsons, popular video games and even

14  ones that glow-in-the-dark.



1
2
3
4
5
6
7
8




9

10    **C.    JUUL's Unlawful Conduct Has Created a Public Nuisance of**
11         **"Epidemic Proportions"**

12        48.    As a result of the strong anti-smoking efforts that have successfully educated young

13    people about the dangers of smoking, youth smoking rates have dramatically decreased over the

14    past decade – from 28% in 2001 to 7.6% in 2017.

15        49.    By picking up where Big Tobacco left off and applying the same techniques that

16    allowed Big Tobacco to ensnare America's youth in nicotine addiction, JUUL has managed to

17    reverse the success of those prior anti-smoking efforts.  Indeed, a 2016 report from the U.S.

18    Surgeon General cited a 900% increase in e-cigarette use by high school students from 2011 to

19    2015, and the 2016 National Youth Tobacco Survey noted that 1.7 million high school students

20    said they had used e-cigarettes in the previous 30 days.[15]  For middle school students, the number

21    was 500,000.  Studies show that one in five eighth-graders that currently use tobacco products got

22    there by starting with an e-cigarette.

23        50.    In September 2018, the FDA declared that teenage use of e-cigarettes had reached

24    "an epidemic proportion," and put manufacturers of the most popular devices, including JUUL, on

25    notice that they had just 60 days to prove that they could keep their devices away from minors.

26

27    _____

28    [15]    Roni Selig, et al., *Vaping now an epidemic among US high schoolers*, CNNhealth (Apr. 6,
2018), https://www.cnn.com/2018/04/06/health/high-schools-vaping-epidemic/index.html.

1   The agency raised the possibility of civil or criminal charges if companies were allowing bulk

2   sales through their websites, as JUUL had done.  On September 28, 2018, the FDA raided JUUL's

3   headquarters, "carting away more than a thousand documents it said were related to the company's

4   sales and marketing practices."[16]  Following the raid, in October 2018, the FDA reiterated that the

5   "new and highly disturbing data [it has] on youth use demonstrates plainly that e-cigarettes are

6   creating an epidemic of regular nicotine use among teens[.]"[17]

7        51.    On November 13, 2018, JUUL bowed to pressure from the FDA and finally agreed

8   to stop selling Mango, Fruit Medley, Crème Brûlée, and Cucumber flavored JUULpods at more

9   than 90,000 retail stores, and agreed to require additional age verification measures for online sales

10  of flavored JUULpods.   The company also announced that it would delete its Facebook and

11  Instagram accounts and halt promotional posts on Twitter.  These purported actions, to the extent

12  they were even taken, have done nothing to curb the epidemic and public nuisance that Defendants

13  created.

14       52.    On September 9, 2019, the FDA issued a Warning Letter that ordered JUUL to

15  cease making unproven claims related to JUUL and specifically noted statements JUUL made

16  directly to students, as noted above:

17           Referring to your ENDS products as "99% safer" than cigarettes, "much safer" than
             cigarettes, "totally safe," and "a safer alternative than smoking cigarettes" is
18           particularly concerning because these statements were made directly to children in
             school. Our concern is amplified by the epidemic rate of increase in youth use of
19           ENDS products, including JUUL's products, and evidence that ENDS products
             contribute to youth use of, and addiction to, nicotine, to which youth are especially
20           vulnerable.

21       53.    In a separate letter to JUUL Chief Executive Officer Kevin Burns requesting

22  documents related to JUUL's marketing campaign, the FDA again recognized JUUL's direct

23  responsibility for the youth vaping epidemic: "[s]ome of this youth use appears to have been a

24  direct result of JUUL's product design and promotional activities and outreach efforts."

25

26  [16]    Jan Hoffman, *F.D.A. Seizes Documents From Juul Headquarters*, THE NEW YORK TIMES
        (Oct. 2, 2018), https://www.nytimes.com/2018/10/02/health/juul-ecigarettes-fda-raid.html.

27
    [17]    *Id.*
28

### D. The Public Nuisance Created by Defendants Has Harmed, and Will Continue to Harm, Plaintiff

54.    Plaintiff and its students are directly impacted by the epidemic Defendants created by targeting students and kids with their unscrupulous marketing and promotional tactics, including through educational presentations directly to students on school premises.

55.    Indeed, *The Wall Street Journal* has described the challenges schools face as a result of the increased use of e-cigarettes among students:[18]

> At Northern High School in Dillsburg, Pa., Principal Steve Lehman's locked safe, which once contained the occasional pack of confiscated cigarettes, is now filled with around 40 devices that look like flash drives.
>
> The device is called a JUUL and it is a type of e-cigarette that delivers a powerful dose of nicotine, derived from tobacco, in a patented salt solution that smokers say closely mimics the feeling of inhaling cigarettes. It has become a coveted teen status symbol and a growing problem in high schools and middle schools, spreading with a speed that has taken teachers, parents and school administrators by surprise.
>
> *          *          *
>
> After two decades of declining teen cigarette use, "Juuling" is exploding. The Juul liquid's 5% nicotine concentration is significantly higher than that of most other commercially available e-cigarettes. JUUL Labs Inc., maker of the device, says one liquid pod delivers nicotine comparable to that delivered by a pack of cigarettes, or 200 puffs – important for adult smokers trying to switch to an e-cigarette. It is also part of what attracts teens to the product, which some experts say is potentially as addictive as cigarettes and has schools and parents scrambling to get a grip on the problem.

56.    Plaintiff and other school boards, districts and systems are uniquely positioned to actually end the vaping epidemic through corrective educational programs and anti-vaping initiatives for their students, among other things.

57.    In order to address the vaping epidemic Defendants created, schools have been forced to hire additional staff to monitor and punish vaping or provide corrective anti-vaping education programs or counseling, increase punishment for vaping violations, ban USB drives that appear similar to JUUL's e-cigarette, install vapor detectors or video surveillance in bathrooms

---

[18]    Anne Marie Chaker, *Schools and Parents Fight a Juul E-Cigarette Epidemic*, The Wall Street Journal, Apr. 4, 2018, https://www.wsj.com/articles/schools-parents-fight-a-juul-e-cigarette-epidemic-1522677246.

CLASS ACTION COMPLAINT                                                                      - 22 -

1    where students gather to vape, or have altogether removed doors to bathrooms or assigned staff to

2    monitor restrooms, and some have even started searching students.[19]

3         58.    Due to the shocking increase in student use of JUUL, Miami-Dade Schools is

4    forced to expend its limited resources to address the vaping epidemic and to protect its students,

5    and Miami-Dade Schools will need to expend additional resources in the future to address and end

6    the vaping epidemic among its students.  Miami-Dade Schools' current available resources to

7    address Defendants' public nuisance are extremely limited.  Miami-Dade Schools requires

8    additional funds to implement more comprehensive efforts to truly address and end the ongoing

9    vaping epidemic that Defendants created.

10    **V.    CLASS ACTION ALLEGATIONS**

11         59.    Plaintiff brings this proposed class action under Rules 23(a), 23(b)(2), and/or

12    23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following nationwide class

13    ("Nationwide Class"):

14         ***All School Boards, Districts, and Systems in the United States that have expended***
15         ***resources to address, or whose property has been affected by, underage use of***
     ***JUUL products.***

16

17         60.    In addition, Plaintiff seeks to represent the following Florida sub-class ("Florida

18    Sub-Class"):

19         ***All School Boards, Districts, and Systems in Florida that have expended***
     ***resources to address, or whose property has been affected by, underage use of***
20         ***JUUL products.***

21         61.    The Nationwide Class and the Florida Sub-Class are collectively referred to herein

22    as the "Classes" or the "Class."

23    ---

24    [19]    Moriah Balingit, *In the 'Juul room': E-cigarettes spawn a form of teen addiction that
worries doctors, parents and schools*, The Washington Post, July 26, 2019,
25    https://www.washingtonpost.com/local/education/helpless-to-the-draw-of-nicotine-doctors-
parents-and-schools-grapple-with-teens-addicted-to-e-cigarettes/2019/07/25/e1e8ac9c-830a-
26    11e9-933d-7501070ee669_story.html; Erin Richards, et al., *Schools are struggling to stop teens
from a dangerous – and deadly – habit: Vaping*, USA Today, Sept. 19, 2019,
27    https://www.usatoday.com/story/news/education/2019/09/19/teen-vaping-epidemic-juul-illness-
school-district-punishment-e-cigarettes/2363190001/.

28

1    62.    Excluded from the Classes are Defendants and any parents, subsidiaries, corporate

2  affiliates, officers, directors, employees, assigns, successors, the Court, Court staff, Defendants'

3  counsel, and all respective immediate family members of the excluded entities described above.

4    63.    Plaintiff reserves the right to revise the definition of the proposed Classes based

5  upon subsequently discovered information and reserves the right to establish sub-classes based on

6  the evidence adduced in discovery, or as necessary and appropriate.

7    64.    **Numerosity.**  The members of the Class are so numerous that individual joinder is

8  impracticable.  Upon information and belief, Plaintiff alleges that the Class contains thousands of

9  members who may be notified of the pendency of this action by first class mail, electronic mail,

10  or published notice.

11    65.    **Commonality and Predominance.**  Common questions of law and fact exist as to

12  all members of the Class and predominate over any questions affecting only individual Class

13  members.  These common legal and factual questions include, but are not limited to, the following:

14    (a)    whether Defendants made material misrepresentations and omissions

15  regarding the safety and addictive nature of JUUL e-cigarettes and JUULpods;

16    (b)    whether Defendants unlawfully marketed their products to minors;

17    (c)    whether Defendants unlawfully contributed to a public nuisance;

18    (d)    whether Defendants breached a duty of care owed to Plaintiff and the Class;

19    (e)    whether Defendants engaged in a pattern of racketeering activity;

20    (f)    whether Defendants are liable for monetary damages to Plaintiff and the

21  Class, and the measure of those damages;

22    (g)    whether Defendants are liable for restitutionary damages to Plaintiff and the

23  Class, and the measure of such restitutionary damages;

24    (h)    whether Defendants acted with malice, fraud or oppression such that they

25  are liable for punitive damages;

26    (i)    whether Defendants were unjustly enriched;

27    (j)    whether Plaintiff and the Class are entitled to abatement; and

28

CLASS ACTION COMPLAINT                                                          - 24

1       (k)      whether Plaintiff and the other Class members are entitled to injunctive and

2   other equitable relief and, if so, what is the nature of such relief.

3       66.   **Typicality**.  Plaintiff's claims are typical of the claims of each Class member in

4   that Defendants' practices harmed Plaintiff in the very same manner that they harmed each of the

5   other Class members.

6       67.   **Adequacy**.  Plaintiff will fairly and adequately protect the interests of the Class.

7   Plaintiff has retained counsel highly experienced in complex consumer class action litigation, and

8   Plaintiff intends to vigorously prosecute this action.  Further, Plaintiff has no interests that are

9   antagonistic to those of the members of the Class.

10      68.   **Superiority**.  A class action is superior to all other available means for the fair and

11  efficient adjudication of this controversy.  The damages or other financial detriment suffered by

12  individual Class members is relatively small compared to the burden and expense that would be

13  involved in individual litigation of their claims.  It would, thus, be virtually impossible for the

14  Class, on an individual basis, to obtain effective redress for the wrongs committed against them.

15  Furthermore, even if Class members could afford such individualized litigation, the court system

16  could not. Individualized litigation would create the danger of inconsistent or contradictory

17  judgments arising from the same set of facts. Individualized litigation would also increase the

18  delay and expense to all parties and the court system from the issues raised by this action. By

19  contrast, the class action device provides the benefits of adjudication of these issues in a single

20  proceeding, economies of scale, and comprehensive supervision by a single United States District

21  Court, and presents no unusual management difficulties under the circumstances here.

22  **VI.    CAUSES OF ACTION**

23                              **COUNT I**

24  **For Violation of the Florida Deceptive and Unfair Trade Practices Act**
25  **Against All Defendants**

26      69.   Plaintiff incorporates by reference each preceding paragraph as though fully set

27  forth herein.

28

CLASS ACTION COMPLAINT                                                    - 25 -

70. The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Stat. Ann. §501.204. In construing the provisions of FDUTPA, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2017." *Id.*

71. During the relevant period, and as alleged herein, Defendants each engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of FDUTPA by actively promoting and marketing e-cigarettes to minors, circulating false and misleading information concerning the safety of e-cigarettes and downplaying or omitting the risk of addiction arising from their use.

72. Defendants' violations of FDUTPA offend Florida public policy, are immoral, unethical, oppressive, or unscrupulous, as well as malicious, wanton, manifesting ill will and causing substantial injury to Plaintiff and its students.

73. As a direct and proximate result of Defendants' FDUTPA violations, Plaintiff has been, and continues to be, harmed.

74. Plaintiff and the Classes are entitled to actual damages, declaratory and injunctive relief, attorneys' fees and costs and all other remedies available under FDUTPA.

**COUNT II**

**For Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962 *et seq.***
**Against All Defendants**

75. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

76. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c).

1    77.    RICO, among other provisions, makes it unlawful for "any person to conspire to

2    violate" the provisions of 18 U.S.C. §1962(c). 18 U.S.C. §1962(d).

3    78.    At all relevant times, Defendants were "persons" under 18 U.S.C. §1961(3) because

4    they are capable of holding, and do hold, a "legal or beneficial interest in property."

5    79.    Plaintiff is a "person" under 18 U.S.C. §1961(3), and has standing to sue as it was

6    injured in its business and/or property as a result of Defendants' wrongful conduct alleged herein.

7    80.    Each Defendant conducted the affairs of an enterprise through a pattern of

8    racketeering activity, in violation of 18 U.S.C. §1962(c).

9    81.    A RICO enterprise is defined as "any individual, partnership, corporation,

10    association, or other legal entity, and any union or group of individuals associated in fact although

11    not a legal entity." 18 U.S.C. §1961(4).

12    82.    A RICO enterprise may be an association-in-fact with no formal legal structure but:

13    (a) a common purpose; (b) a relationship among the associates of the enterprise; and (c) longevity

14    to pursue the enterprise's purpose.

15    83.    Defendants and other entities that assisted them in deceptively and unlawfully

16    marketing JUUL's e-cigarette to minors formed an association-in-fact ("RICO Enterprise").

17    84.    The RICO Enterprise is ongoing, continuing and was created to achieve a common

18    purpose to deceptively and unlawfully market JUUL's e-cigarette to minors by deceiving them

19    about the dangers of vaping in order to exponentially grow JUUL's share of the e-cigarette market

20    and increase their profits through unlawful means.

21    85.    The members of the RICO Enterprise are connected through contractual

22    agreements, but the members of the RICO Enterprise have an existence separate from the RICO

23    Enterprise.

24    86.    After abandoning its own unsuccessful efforts to compete with JUUL with its own

25    line of fruit-flavored e-cigarette pods, and expressing a purported concern over fruity flavors

26    contributing to the underage vaping epidemic, Altria acquired a 35% stake in JUUL with a

27    $12.8 billion equity investment, thereby forming a RICO Enterprise intent on increasing JUUL's

28    reach to minors through unlawful, deceptive and unconscionable means.

CLASS ACTION COMPLAINT                                                    - 27 -

87.     In furtherance of the RICO Enterprise, Defendants acted to hide their agenda by falsely denying that they were marketing directly to minors using the time-tested techniques that brought enormous success to Big Tobacco generations earlier.  Defendants also made false and misleading statements about the nicotine content in JUUL e-cigarettes and downplayed or omitted the risk of addiction from their use, all with the goal of addicting new underage customers who were misled by Defendants to believe that JUUL's e-cigarette was not as harmful as traditional cigarettes.  Other unnamed members of the RICO Enterprise, including, but not limited to, marketing agencies and consultants and social media influencers, pushed these deceptive messages to children through youth-oriented print campaigns, pop-up parties, social media campaigns, and school marketing presentations disguised as "educational" presentations.

88.     To further the objective of the RICO Enterprise, its members knowingly conducted or participated in, either directly or indirectly, the affairs of the RICO Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5), and 1962(c), specifically by employing the use of the mail and wire facilities, in violation of 18 U.S.C. §1341 (mail fraud) and 18 U.S.C. §1343 (wire fraud).

89.     The multiple acts of racketeering activity conducted by the members of the RICO Enterprise were made within ten years, were related to each other, and, thus, constitute a "pattern of racketeering activity."

90.     The members of the RICO Enterprise used, directed the use of, and/or caused to be used thousands of interstate mail and wire communications to carry out a material scheme and/or artifice to defraud the public and further the RICO Enterprise's objectives through misrepresentations and material omissions regarding their efforts to market directly to children, the nicotine content of the JUUL e-cigarette, and the risk of addiction associated with its use.

91.     The acts of racketeering committed by the RICO Enterprise were committed intentionally and knowingly in order to advance its objectives.

92.     Plaintiff has been injured and has sustained damage to its business and property as a direct and proximate result of Defendants' RICO violations and racketeering activity.

93.     Plaintiff is therefore entitled to recover actual and treble damages, and its costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. §1964(c).

## COUNT III

### For Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(d) Against All Defendants

94.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

95.     At all relevant times, Defendants were associated with the RICO Enterprise and agreed and conspired to violate 18 U.S.C. §1962(c), that is agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(d).

96.     Defendants engaged in a scheme to defraud residents of the district overseen by, and students of, Plaintiff and the other Class members by marketing the JUUL e-cigarette through false and deceptive statements, *i.e.*, by directly marketing to minors and misrepresenting the safety of the product and hiding the addictive nature of the product.

97.     Defendants committed, or caused to be committed, a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including, but not limited to, the sale of nicotine products to minors and the related acts of mail fraud and wire fraud set forth above.

98.     As a result of Defendants' violations of 18 U.S.C. §1962(d), Plaintiff and the other Class members suffered direct damages.

## COUNT IV

### Public Nuisance Against All Defendants

99.     Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

100.    Defendants, individually and acting through their employees and agents, have unreasonably interfered, and continue to interfere, with a right common to the general public, including by: (a) interfering significantly with Miami-Dade Schools' public health, safety, peace,

comfort, and convenience; (b) engaging in conduct proscribed by statute, ordinance, or administrative regulation; and (c) engaging in conduct of a continuing nature that has produced a permanent and long-lasting effect.

101.    Each of the Defendants unreasonably interfered with the public health, safety, peace, and comfort of Miami-Dade Schools and its students by, among other things, actively promoting and marketing e-cigarettes to minors, disseminating false and misleading information concerning the safety of e-cigarettes, and downplaying or omitting the risk of addiction arising from their use in violation of FDUTPA.  In so doing, Defendants acted unreasonably and with actual malice.

102.    As detailed herein, Defendants' conduct has interfered, and continues to interfere, with rights common to the general public of Miami-Dade Schools and has caused Plaintiff to sustain damages to combat the public nuisance that are special and particular, of a kind not sustained by the general public, including, but not limited to, diversion of resources, increased educational expenditures, and increased staffing expenditures, among other things.

103.    Plaintiff, acting on its own behalf and on behalf of its students and the Classes, seeks monetary and injunctive relief to halt the threat of future harm and to abate the ongoing public nuisance Defendants created.

**COUNT V**

**Negligence**
**Against All Defendants**

104.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

105.    Negligence is established where the defendant owes the plaintiff a duty of care, breaches that duty, and the plaintiff sustains an injury or loss proximately caused by the defendant's breach.  Violation of a statute or regulation constitutes evidence of negligence.

106.    Defendants owed Plaintiff, acting on its own behalf and on behalf of its students, statutory and common-law duties, including the duty to promote and market e-cigarettes truthfully, to disclose the risks of addiction associated with e-cigarette use, and to not market e-cigarettes to

minors.  Each of the Defendants breached those duties by, among other things, promoting and marketing e-cigarettes directly to minors, misrepresenting the safety of e-cigarettes and downplaying or omitting the risk of addiction from their use.  In so doing, Defendants acted with actual malice.

107.    Plaintiff and its students and the Classes have suffered, and continue to suffer, both injuries and pecuniary losses directly and proximately caused by Defendants' breaches.  Among other things, Defendants have caused Plaintiff to suffer damages in the form of diversion of resources, increased educational expenditures, and increased staffing expenditures.  Defendants' breaches of the statutory and common-law duties they each owed to Plaintiff and its students and the Classes are the proximate cause of the current vaping crisis and its resultant harm to Plaintiff and its students.

**COUNT VI**

**Unjust Enrichment**
**Against All Defendants**

108.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

109.    Plaintiff conferred a benefit upon Defendants.  The unprecedented underage nicotine addiction epidemic resulted in substantial costs in diversion of resources, increased educational expenditures, and increased staffing expenditures, among other things.

110.    The unjust enrichment of Defendants is directly related to the damage, loss, and detriment to Miami-Dade Schools caused by Defendants' false and unconscionable marketing to children.  It would be inequitable under these circumstances for Defendants to retain this benefit without compensating Plaintiff for its value.

111.    Defendants appreciated those benefits or had knowledge of those benefits and accepted or retained those benefits under such circumstances as to make it inequitable for Defendants to retain those benefits without the payment of its value to Plaintiff.

112.    Defendants have thus been unjustly enriched by sales due to their deceptive marketing, which contributed to the current vaping epidemic.

113.    Plaintiff seeks recovery of the amounts by which Defendants were enriched as a result of their inequitable conduct.

**VII.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.    An Order certifying the Nationwide Class and Florida Sub-Class as requested herein, appointing Plaintiff as Class Representative, and appointing Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.    An Order finding that the conduct alleged herein constitutes a public nuisance;

C.    An Order requiring Defendants to abate the public nuisance described herein and to deter and/or prevent the resumption of such nuisance, including through the establishment of an abatement fund to be used by Plaintiff and the Classes to remedy the effects of the public nuisance;

D.    An Order awarding actual and compensatory damages, statutory damages in the maximum amount permitted by law, punitive damages, and pre-judgment and post-judgment interest;

E.    An Order awarding declaratory, injunctive, and other equitable relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices described herein, and directing Defendants to identify, with this Court's supervision, victims of its conduct and to pay them restitution of all monies acquired through any act or practice declared by this Court to be wrongful or unlawful;

F.    Awarding restitution and disgorgement of Defendants' revenues to Plaintiff and the other Class members;

G.    Awarding Plaintiff attorneys' fees and costs; and

H.    Providing any and all further legal and equitable relief as this Court may deem just and proper.

1

## VIII.    JURY TRIAL DEMAND

2

Plaintiff respectfully demands a trial by jury on all issues herein.

3    DATED:  December 19, 2019                ROBBINS GELLER RUDMAN
                                                & DOWD LLP
4                                           CHRISTOPHER C. GOLD (*Pro Hac Vice*)
                                            JASON H. ALPERSTEIN
5                                           MARK J. DEARMAN
                                            STUART A. DAVIDSON (*Pro Hac Vice*)
6                                           DOROTHY P. ANTULLIS
                                            ERIC S. DWOSKIN
7

8                                                   *s/ Christopher C. Gold*
                                            CHRISTOPHER C. GOLD
9
                                            120 East Palmetto Park Road, Suite 500
10                                          Boca Raton, FL  33432
                                            Telephone:  561/750-3000
11                                          561/750-3364 (fax)
                                            cgold@rgrdlaw.com
12                                          jalperstein@rgrdlaw.com
                                            mdearman@rgrdlaw.com
13                                          sdavidson@rgrdlaw.com
                                            dantullis@rgrdlaw.com
14                                          edwoskin@rgrdlaw.com

15                                          KOPELOWITZ OSTROW FIRM, P.A.
                                            SCOTT J. WEISELBERG
16                                          1 West Las Olas, Suite 500
                                            Fort Lauderdale, FL  33301
17                                          Telephone:  954/525-4100
                                            954/525-4300 (fax)
18                                          weiselberg@kolawyers.com

19                                          HALICZER, PETTIS & SCHWAMM, PA
                                            EUGENE K. PETTIS
20                                          One Financial Plaza, Seventh Floor
                                            100 SE 3rd Avenue
21                                          Fort Lauderdale, FL  33394
                                            Telephone:  954/523-9922
22                                          954/522-2512 (fax)
                                            EPettis@hpslegal.com
23
                                            *Attorneys for Plaintiff and the Proposed Class*
24

25

26

27

28

CLASS ACTION COMPLAINT                                                      - 33 -